**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 23-cr-00026-2 |
| | : | |
| PHILLIP GILLARD | : | |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                    **January 24, 2024**

      Defendant, who is currently charged in a multi-count superseding indictment with conspiring to traffic illegal narcotics, possessing and distributing illegal narcotics, and firearms offenses, has filed several pretrial motions. Among those motions are three counseled motions: (1) a Motion to Sever; (2) A Motion to Suppress Photographs and Video Evidence from Pole Cameras; and (3) A Motion to Suppress Fruits of a Search of Defendant's Residence at 3006 Tulip Street in Philadelphia. Also among those motions are four motions which Defendant improperly filed in a *pro se* capacity while represented by counsel, and which counsel later refiled on Defendant's behalf. These motions include: (1) A Motion to Suppress Physical Evidence; (2) A Motion to Dismiss for Ineffective Assistance of Counsel; (3) A Motion for a Speedy Trial; and (4) A Motion to Suppress Cell Phone Evidence. For the reasons discussed below, Defendant has failed to show he is entitled to relief on any of these motions. Consequently, these motions will be denied.

## I.       BACKGROUND

      On January 24, 2023, the Grand Jury returned a 50-count Indictment charging Defendants, Diane Gillard ("Ms. Gillard"), Phillip Gillard ("Mr. Gillard"), Raphael Sanchez, Sharif Jackson, Amin Whitehead, Cesar Maldonado, Terrence Maxwell, Melvin Dreher, and Arron Preno, with

various drug and firearm charges, all arising out of illegal activities occurring in Philadelphia, Pennsylvania, from approximately April 2021 through January 6, 2023. *See* ECF No. 1. Then, on July 18, 2023, the Grand Jury returned a 54-count Superseding Indictment charging Defendants with similar types of offenses, adding a few additional charges, and extending the period of alleged criminal activity to include approximately April 2021 through January 25, 2023. *See* ECF No. 91. In the Superseding Indictment, the Grand Jury charged Defendants Ms. Gillard, Mr. Gillard, Raphael Sanchez, Sharif Jackson, Amin Whitehead, Cesar Maldonado, and Terrence Maxwell with conspiracy to distribute methamphetamine, phencyclidine ("PCP"), fentanyl, cocaine base ("crack"), cocaine, and heroin, in violation of 21 U.S.C. § 846.[1] *See* Superseding Indictment at 1–13, ECF No. 91. The other charges against each Defendant contained in the Superseding Indictment are as follows:

1. Ms. Gillard
   - 19 counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)-(B);[2]
   - 19 counts of distribution of a controlled substance within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860(a);[3] and
   - One count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e).[4] *See id.* at 14–23, 27–34, 39–40, 44–64.

2. Mr. Gillard
   - Three counts of distribution of 1,000 grams or more of PCP, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A);[5]
   - Two counts of distribution of 100 grams or more of PCP, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B);[6]
   - Three counts of distribution of 1,000 grams or more of PCP within 1,000 feet of a protected location, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 860(a);[7]

---

[1] Count 1.
[2] Counts 2, 4, 6, 8, 10, 15, 17, 19, 21, 27, 32, 35, 37, 39, 41, 43, 45, 47, 49.
[3] Counts 3, 5, 7, 9, 11, 16, 18, 20, 22, 28, 33, 36, 38, 40, 42, 44, 46, 48, 50.
[4] Count 51.
[5] Counts 27, 45, and 49.
[6] Counts 15 and 19.
[7] Counts 28, 46, and 50.

- Two counts of distribution of 100 grams or more of PCP within 1,000 feet of a protected location, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 860(a);[8]
- One count of possession with intent to distribute 1,000 grams or more of PCP, 500 grams or more of cocaine, fentanyl, crack, and heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C);[9]
- One count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1);[10] and
- One count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[11] *See id.* at 27–28, 31–32, 39–40, 57–58, 61–62, 65–67.

3. <u>Raphael Sanchez</u>
- Six counts of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A);[12] and
- Six counts of distribution of 50 grams or more of methamphetamine within 1,000 feet of a protected location, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 860(a).[13] *See id.* at 16–19, 22–23, 29–30, 33–34, 55–56.

4. <u>Sharif Jackson</u>
- Two counts of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A);[14] and
- Two counts of distribution of 50 grams or more of methamphetamine within 1,000 feet of a protected location, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 860(a).[15] *See id.* at 29–30, 51–52.

5. <u>Amin Whitehead</u>
- One count of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A);[16]
- Two counts of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);[17]
- One count of possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);[18]

---

[8] Counts 16 and 20.

[9] Count 52.

[10] Count 53.

[11] Count 54.

[12] Counts 4, 6, 10, 17, 21, and 43.

[13] Counts 5, 7, 11, 18, 22, and 44.

[14] Counts 17 and 39.

[15] Counts 18 and 40.

[16] Count 4.

[17] Counts 23 and 25.

[18] Count 29.

- Three counts of distribution of a controlled substance within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860(a);[19]
- One count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1);[20] and
- One count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[21] *See id.* at 16–17, 35–38, 41–43.

6. <u>Caesar Maldonado</u>
- Two counts of distribution of 40 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B);[22] and
- Two counts of distribution of 40 grams or more of fentanyl within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860(a).[23] *See id.* at 53–54, 59–60.

7. <u>Terrence Maxwell</u>
- One count of possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);[24]
- One count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1);[25] and
- One count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[26] *See id.* at 24–26.

8. <u>Melvin Dreher</u>
- One count of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A);[27] and
- One count of distribution of 50 grams or more of methamphetamine within 1,000 feet of a protected location, in violation of 21 U.S.C. §§ 860(a), 841(a)(1), (b)(1)(A).[28] *See id.* at 33–34.

9. <u>Arron Preno</u>
- One count of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).[29]

---

[19] Counts 5, 24, and 26.
[20] Count 30.
[21] Count 31.
[22] Counts 41 and 47.
[23] Counts 42 and 48.
[24] Count 12.
[25] Count 14.
[26] Count 13.
[27] Count 21.
[28] Count 22.
[29] Count 34.

On August 24, 2023, the Court, at Mr. Gillard's request, allowed his then-defense counsel, Christian J. Hoey, Esq., to withdraw as counsel, and appointed Vernon Z. Chestnut, Esq. as his new defense counsel.[30] *See* ECF No. 118. Even though the Court had appointed Attorney Chestnut to represent Mr. Gillard, he submitted a number of *pro se* documents over the course of approximately two months. *See* ECF Nos. 119, 127, 129, 149, 151, 157. Through three separate orders, the Court denied Mr. Gillard's improperly filed *pro se* motions without prejudice to them being refiled after Mr. Gillard consulted with Attorney Chestnut. *See* ECF Nos. 138, 153, 155.

Attorney Chestnut filed several pretrial motions on Mr. Gillard's behalf on October 16, 2023. *See* ECF Nos. 163–69. Among those motions were copies of four of Mr. Gillard's improperly filed *pro se* motions which Attorney Chestnut adopted and filed as counseled motions without any substantive changes to the original submissions. Those motions included: (1) A Motion to Suppress Physical Evidence, *see* ECF No. 163; (2) A Motion to Dismiss for Ineffective Assistance of Prior Counsel, *see* ECF No. 164; (3) A Motion for Speedy Trial, *see* ECF No. 165; and (4) A Motion to Suppress Cell Phone Evidence, ECF No. 167. Also among those motions were three counseled motions: (1) A Motion to Sever, *see* ECF No. 166; (2) A Motion to Suppress Photographs and Video Evidence from Pole Cameras, *see* ECF No. 168; and (3) A Motion to Suppress Fruits of a Search of Defendant's Residence at 3006 Tulip Street in Philadelphia, *see* ECF Nos. 169, 176.[31] The Government filed an Omnibus Response to Defendant's Pretrial Motions on October 31, 2023. *See* ECF No. 184. The Court held an evidentiary hearing on Mr. Gillard's motions to suppress on December 12, 2023. After the hearing, and with the Court's leave, Mr. Gillard and the Government filed supplemental briefs in support of their respective positions

---

[30] Attorneys Hoey and Chestnut were appointed as Criminal Justice Act counsel.
[31] As explained further below, Mr. Gillard filed identical motions on October 16, 2023, *see* ECF No. 169, and October 17, 2023, *see* ECF No. 176.

on certain testimony that was given during the evidentiary hearing. *See* ECF Nos. 219, 220. With the briefing concluded, Mr. Gillard's motions are all ripe for disposition and will be addressed in turn.[32]

## II.   DISCUSSION

### A.   Mr. Gillard's Motion to Suppress Physical Evidence (ECF No. 163)

This Motion was originally improperly submitted by Mr. Gillard *pro se* while he was represented by Attorney Chestnut.[33] *Compare* ECF No. 151, *with* ECF No. 163 at ECF pp. 5–6.[34] Attorney Chestnut later adopted the *pro se* Motion as his own and asked the Court to accept it as a counseled filing.[35] *See* Def.'s Mot. to Suppress Physical Evid. at ECF p. 2. This Motion will be denied.

---

[32] While not referenced in this background section, the Court held a status of counsel hearing with Mr. Gillard and Attorney Chestnut on January 16, 2024. During the hearing, Mr. Gillard expressed his desire to represent himself at trial with the assistance of standby counsel. After a thorough colloquy of Mr. Gillard to ensure his choice to represent himself was knowing, intelligent, and voluntary, the Court permitted Attorney Chestnut to withdraw and indicated that an order would be entered appointing standby counsel for him. Thus, Mr. Gillard is now proceeding in a *pro se* capacity with the assistance of standby counsel, Glennis L. Clark, Esq. *See* ECF No. 255.

[33] This is commonly referred to as "hybrid representation," and is prohibited. *See United States v. Johnson*, 899 F.3d 191, 206 (3d Cir. 2018) ("The rule against hybrid representation forbids a party to file a pro se brief supplementing his counseled brief." (citing *United States v. Turner*, 677 F.3d 570, 578 (3d Cir. 2012)); *see also McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) (explaining that *Faretta v. California*, 422 U.S. 806 (1975) "does not require a trial judge to permit 'hybrid' representation").

[34] Technically, Mr. Gillard's previous filing was not a motion. Instead, it was a "Supplemental Brief in Support of Motion to Suppress Fruits of Unlawful Arrest." *See* ECF No. 151.

[35] In its opposition to the Motion, the Government expressed that it was "greatly troubled by defense counsel's full endorsement of th[is] *pro se* filing without any additions, deletions, or further legal analysis" because the *pro se* Motion was "meritless, frivolous, and [had] no basis in law or fact." Gov't Omnibus Resp. to Def.'s Pretrial Mots. ("Omnibus Resp.") at 20, ECF. No. 184. It further asserted that the *pro se* Motion "fail[ed] to meet [the] minimal standards [under Federal Rule of Criminal Procedure 47(b)] for a motion in a federal criminal case." *Id.*

While the Court is somewhat troubled by Attorney Chestnut simply attaching Mr. Gillard's *pro se* Motion and adopting it without any further legal development of the claims within it, it appears that his choice was for the best as Mr. Gillard is now proceeding *pro se*, and he had expressed displeasure with Attorney Chestnut allegedly not doing what Mr. Gillard wanted him to

### 1.      Mr. Gillard's Arguments

In the Motion, Mr. Gillard essentially asserts that there are recklessly false statements or omissions in "[a]ll of the affidavits in question." *Id.* at ECF p. 5. He claims that once those false statements are removed from the affidavits, the remainder of the information in the affidavits are insufficient to demonstrate probable cause. *See id.* (referencing *Franks v. Delaware*, 438 U.S. 154 (1978)).

Concerning the alleged false statements and omissions, Mr. Gillard avers that "[w]hile the contested affidavits have many problems, they all share two fundamental flaws." *Id.* Those flaws allegedly are: (1) The affidavits failed to inform the Magistrate Judge that the confidential informant was the only eyewitness to any of the alleged transactions involving him; and (2) The affidavits do not contain sufficient information for the Magistrate Judge to determine that the confidential informant was competent, reliable, and trustworthy. *See id.* Mr. Gillard then attempts to challenge the "AFFIDAVIT FOR JANUARY 25th, 2023," by seemingly pointing out that there allegedly was, *inter alia*, (1) no information about the dates the transactions took place, (2) no indication whether the affidavit was referencing transactions he was making on any listed dates, (3) the confidential informant never saw a transaction between him and Ms. Gillard, (4) Ms. Gillard never left with anything from his house and any evidence the Government has to the contrary is hearsay, which "is not good enough for a conviction or for the court," and (5) there was no evidence of what occurred once Ms. Gillard entered the property at 3006 Tulip Street in Philadelphia. *See id.*

---

do. Thus, with this particular Motion, the Court can address what Mr. Gillard claims is a constitutional violation.

Mr. Gillard goes on to claim that "[t]he final sentence in [his] affidavit of probable cause betrays the disregard for the truth that affects this entire case, all the way down to the dates." *Id.* at ECF p. 6. He contends that the affidavit of probable cause and the search warrant have a date of "August 3rd, 2023." *Id.* As far as he is concerned, the use of this date

> leaves false information on all dockets of Affidavit of Probable cause forms, and it is clear, very clear, that somebody of both parties (the PPD and the FBI, and the US Attorney) gave false information when the false information is removed and the the [sic] purposefully omitted information is considered, it is clear that the magistrate was not given a clear and complete picture of the situation and would have found probable cause to arrest for all dates: June 15th, July 14th, August 9th, December 1st, 2022, and [sic] January 6th, January 25th of 2023. The affidavits are very brief and reckless and contain serious omissions that undercut the finding of probable cause. Any reasonable person would expect that a judge would need full and accurate explanation of facts, not sugar coated and cherry picked.

*Id.* He lastly asserts that "[t]he affidavit admits the informant set up the whole thing[, b]ut not with [him]," and "[a]ll buys were set up by text, but not with [him]." *Id.*

### 2.    The Government's Arguments in Opposition to the Motion

In its response to this Motion, the Government requests that the Court deny the Motion because Mr. Gillard has the burden to show a basis for his motion, and he neither identifies a single fact in support of his Motion nor specifies which search warrant he is challenging. *See* Omnibus Resp. at 21–22. Instead, the Motion is replete with conclusory allegations. *See id.* at 21. In addition, it claims that the Motion failed to provide it "with notice of what specific law enforcement conduct is being challenged[, which] makes it difficult for [it] to formulate a meaningful response." *Id.* at 22.

### 3.    Applicable Law

#### a.    Review of Search Warrants Generally

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Absent exigent circumstances,

investigating officers must obtain a warrant prior to executing a search of an individual's home. *See Payton v. New York*, 445 U.S. 573, 586 (1980). A warrant may issue only upon a determination by a neutral magistrate that, given the totality of the circumstances set forth in the affidavit, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," probable cause exists to support the proposed search. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause  supported by Oath or affirmation . . . ."). Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found" in the location described in the warrant. *Gates*, 462 U.S. at 238. This a "flexible, common-sense standard" which does not require proof that evidence is more likely than not to be recovered during the search. *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause is also a "fluid concept, turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232.

When considering a challenge to the validity of a search warrant, "the task of the reviewing court is not to conduct a *de novo* determination of probable cause." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). Likewise, the reviewing court "need not determine that probable cause actually existed[.]" *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). Instead, the reviewing court must decide whether the issuing magistrate had "a 'substantial basis' for finding probable cause." *Id.* (quoting *United States v. Jones*, 994 F.2d 1051, 1054 (3d Cir. 1993)). During this review, the court should "give great deference to the magistrate judge's probable cause determination." *Id.* (citations omitted). If a substantial basis exists to support the probable cause finding, the reviewing court must uphold that finding even if it or a "different magistrate judge

might have found the affidavit insufficient to support a warrant." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993).

In addition, the reviewing court must confine itself "to the facts that were before the magistrate judge," and not "information from other portions of the record." *Id.* (quoting *Jones*, 994 F.2d at 1055). In other words, the reviewing court should only assess the facts within the four corners of the probable cause affidavit. *See United States v. Beatty*, 437 F. App'x 185, 187 (3d Cir. 2011). Moreover, "[t]he supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner." *Conley*, 4 F.3d at 1206. If, based on the foregoing, the reviewing court finds that the magistrate had a substantial basis for concluding that the warrant affidavit established probable cause, the court must uphold the warrant as valid. *See United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000); *see also United States v. Herrera*, No. CRIM. A. 15-22, 2015 WL 3536616, at *4 (E.D. Pa. June 5, 2015) ("Although the district court should not simply 'rubber stamp' the issuing judge's conclusions, *Whitner*, 219 F.3d at 296 (citing *Jones*, 994 F.2d at 1055), the Supreme Court has directed that 'doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' [*United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citing *Gates*, 462 U.S. at 237 n.10).");, *aff'd sub nom.*, *United States v. Suarez-Arzon*, 664 F. App'x 180 (3d Cir. 2016).

### b. *Franks* Motion

Pursuant to *Franks*, criminal defendants may challenge the veracity of factual representations made in an affidavit upon which a magistrate relied in issuing a warrant. 438 U.S. at 172. To overcome the general presumption of validity attendant to search warrant affidavits and compel an evidentiary hearing, the defendant must make a "substantial preliminary showing" that the affidavit contained false statements of material fact made knowingly or with reckless disregard

for the truth. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). The defendant must predicate their attack on "more than a mere desire to cross examine." *Franks*, 438 U.S. at 171. The attack must be supported by accompanying offers of proof, such as sworn affidavits "or otherwise reliable statements of witnesses." *Id.* Mere allegations of negligence or error fall short of a substantial preliminary showing. *See id.* ("Allegations of negligence or innocent mistake are insufficient."). The defendant must challenge the affiant's state of mind, and allege that the affidavit contains intentional falsehoods, statements that the "officer has obvious reasons to doubt," or omissions of fact that "any reasonable person would want to know." *Yusuf*, 461 F.3d at 383 (citing *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000)).

Even if the defendant makes this requisite showing, no hearing is required if, after the allegedly false material is stricken from the affidavit, there remains a sufficient basis for finding probable cause. *See Franks*, 438 U.S. at 172. If the remaining material is insufficient, the defendant is entitled to a full hearing on the allegations. *See id.* At this hearing, the defendant must

> prove, by a preponderance of the evidence: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination.

*Yusuf*, 461 F.3d at 383 (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). If the defendant satisfies this burden, "the Fourth Amendment requires that . . . the fruits of the search [be] excluded to same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

### 4.  Analysis

Before addressing the parties' arguments on the instant Motion, the Court notes that "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63

F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for [their] motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government," *id.*, where it needs to show by a preponderance of the evidence "that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *see United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) (indicating applicable burden is preponderance of the evidence). In this instance, Mr. Gillard has failed to establish any non-conclusory basis for his Motion, has failed to identify the evidence he seeks to have the Court suppress, has failed to sufficiently identify the affidavits of probable cause/warrants he is challenging, and has failed to identify the specific portions of the affidavits of probable cause which allegedly contain false information. As such, the burden remains with Mr. Gillard to show that a Fourth Amendment violation occurred.

Mr. Gillard has failed to satisfy his burden generally, especially as to his arguments under *Franks*. Regarding *Franks*, Mr. Gillard has not come close to a "substantial preliminary showing" that any affidavit relating to him contained false statements of material fact made knowingly or with reckless disregard for the truth. He has also failed to otherwise show that any Magistrate Judge who issued warrants relating to him lacked a substantial basis for concluding that there was probable cause to issue the warrants. Accordingly, this Motion to Suppress will be denied.

### B.     Mr. Gillard's Motion to Dismiss (ECF No. 164)

This is another of Mr. Gillard's improper *pro se* filings that Attorney Chestnut incorporated into a counseled motion. *Compare* ECF No. 119, *with* ECF No. 164 at ECF p. 5. This Motion will be denied.

### 1.      Mr. Gillard's Arguments

In this Motion, Mr. Gillard essentially argues that the Court should dismiss the case against him because Attorney Hoey was ineffective insofar as he was attempting to get Mr. Gillard to plead guilty without first conducting a full investigation into the case. *See* Mot. to Dismiss at ECF p. 5, ECF No. 164. Mr. Gillard asserts that Attorney Hoey "made no attempt whatsoever to determine that [he] is actually innocent of the crimes charged." *Id.* He goes on to allege that "[i]f [Attorney Hoey] had, he would have seen that all the weapons charges were completely unfounded, the conspiracy charge consists of nothing but accusations of people talking too much, and the PCP charges are blown way out of proportion." *Id.*

### 2.      The Government's Arguments in Opposition

The Government requests that the Court deny this Motion because it is frivolous. *See* Omnibus Resp. at 20. It contends that the Motion contains only conclusory statements and fails to otherwise inform the Court about how Attorney Hoey was allegedly ineffective. *See id.* In addition, it points out that Mr. Gillard failed to reference any legal authority that would warrant dismissal of charges during the pendency of a criminal prosecution due to the alleged ineffective assistance of defense counsel. *See id.*

### 3.      Analysis

As the Government points out, Mr. Gillard has not identified any legal authority which would allow a defendant facing charges in an indictment to seek dismissal of the case against them based on the alleged ineffective assistance of their defense counsel. The Court also could not locate any such authority. Even if it was remotely possible to seek such relief, Mr. Gillard's allegations are meritless. He has offered no proof that Attorney Hoey failed to conduct any investigation on his behalf, and even if he did, the Court allowed Attorney Hoey to withdraw near the end of August

2023 and appointed new defense counsel to represent him. *See* ECF No. 118. He has presented no evidence that Attorney Hoey's conduct has prejudiced him in this case in any way whatsoever. Accordingly, this Motion is denied.

### C.   Mr. Gillard's Motion for Speedy Trial (ECF No. 165)

This is the third *pro se* submission from Mr. Gillard that Attorney Chestnut incorporated into a counseled motion. *Compare* ECF Nos. 129, 157, *with* ECF No. 165 at ECF pp. 5, 7. This Motion will be denied.

#### 1.   Mr. Gillard's Arguments

As far as the Court can discern, Mr. Gillard claims that he has never waived his right to a speedy trial and does not consent to any further continuances. *See* Mot. for Speedy Trial at ECF pp. 5, 7, ECF No. 165. He objects to the continuances already granted and "will raise these objections in an upcoming motion." *Id.*

#### 2.   The Government's Arguments in Opposition

The Government asserts that the Court should deny the Motion because Mr. Gillard "does not state what relief he is seeking, nor does he state a single pertinent fact." Omnibus Resp. at 21. The Government also notes that Mr. Gillard has ignored this Court designating the case as a complex case under 18 U.S.C. § 3161(h)(8)(A), (B)(ii). *See id.* It further points out that Mr. Gillard's filing references an "upcoming motion" even though no such motion has ever been filed. *See id.*

#### 3.   Analysis

Although the Court generally excuses Attorney Chestnut's conduct in simply attaching Mr. Gillard's *pro se* filings to a Motion without any additional information or legal analysis, on this

occasion, it dooms the instant "Motion" because it is not actually a motion.[36] Instead, all Mr.

Gillard has done is submit a notice to the Court where he complains that his speedy trial rights are

---

[36] By noting Attorney Chestnut's actions preclude any relief on the instant Motion, the Court is **not** stating that he was ineffective. Even if Mr. Gillard had moved for dismissal based on a purported speedy trial violation, his motion would be meritless.

Under the Speedy Trial Act, "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Here, the Grand Jury returned the Indictment on January 24, 2023, *see* ECF No. 1, but Mr. Gillard did not appear before a judicial officer of the EDPA until January 26, 2023. *See* ECF No. 16 (noting that Mr. Gillard appeared before Judge Lloret on "1/26/23"). Therefore, Mr. Gillard's "clock" under the Speedy Trial Act started on January 26, 2023, even though he was later arraigned on January 31, 2023. *See* ECF No. 31 (noting that Mr. Gillard appeared before Magistrate Judge Reid on "1/31/23"); *United States v. Adams*, 36 F.4th 137, 145 (3d Cir. 2022) ("In this case, the speedy trial clock commenced with Adams's arraignment on December 16, 2015 because he did 'not appear before a judicial officer prior to his original indictment, [so] his arraignment ... constituted his initial appearance for Speedy Trial Act purposes.'" (quoting *United States v. Willaman*, 437 F.3d 354, 357 (3d Cir. 2006))).

Based on this January 26, 2023 speedy trial start date, the Government would have had 70 days, i.e., until April 6, 2023, to try Mr. Gillard. However, the Speedy Trial Act provides that certain periods of delay "shall be excluded in computing the time . . . within which the trial of any such offense must commence[.]" 18 U.S.C. § 3161(h). Among those periods is "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). When considering whether to grant a continuance under subsection (7)(A), the trial judge can consider, *inter alia*, "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." *Id.* § 3161(h)(7)(B)(ii).

Here, the Government filed a Motion for Complex Case Declaration and Special Listing of Criminal Number 23-26 on March 8, 2023. *See* ECF No. 58. That same day, the Court entered an Order granting the Government's Motion. *See* ECF No. 61. In the Order, the Court determined that the case was "so unusual and complex due to the nature of the prosecution, the number of defendants, and the amount of evidence that it is unreasonable to expect adequate preparation for pretrial proceedings or the trial itself within the time limits established by the Speedy Trial Act." Mar. 8, 2023 Order at ¶ 2, ECF No. 61. The Court also specifically identified the reasons for reaching that determination about the case's complexity. *See id.* at ¶ 3. The Court further found that "the ends of justice will be served by granting a continuance beyond the time limits established

being violated without identifying any reason why these purported violations are occurring or specifying the relief he is requesting. *See* Fed. R. Crim. P. 47(b) ("A motion must state the grounds on which it is based and the relief or order sought."). Even if the Court treated the Motion as a *pro se* Motion and liberally interpreted it, relief would not be warranted because Mr. Gillard has failed to establish any ground for this Court to find a Speedy Trial Act violation. Accordingly, this Motion will be denied.

###   D.   Mr. Gillard's Motion to Sever (ECF No. 166)

In this Motion, Mr. Gillard seeks to sever his charges in the Superseding Indictment from those of his remaining Co-Defendants, Sharif Jackson ("Jackson"), Terrence Maxwell ("Maxwell"), and Melvin Dreher ("Dreher"). *See* Mot. for Severance Pursuant to Fed. R. Crim. P. 14(a) at ECF p. 3, ECF No. 166. This Motion will be denied.

---

by the Speedy Trial Act in this case. The ends of justice served by this Order outweigh the best interests of the public and the defendants in a speedy trial." *Id.* at ¶ 4.

By the time the Court entered this March 8, 2023 Order, 41 days of the 70-day speedy trial time had passed. Although there would have been other noted exclusions to the calculations under the Speedy Trial Act due to some of Mr. Gillard's actions regarding his counsel and his filing of pretrial motions, *see* 18 U.S.C. § 3161(h)(1)(D) (providing that "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from speedy trial calculations), they need not be addressed here because it appears that the clock has not restarted to date, and there does not appear to be any violation of the Speedy Trial Act at this time. Additionally, it is possible that the Standing Orders Chief Judge Sanchez still had in place relating to holding trials during the COVID-19 pandemic were still applicable to this case until he terminated those Standing Orders on April 21, 2023. *See* https://www.paed.uscourts.gov/local-rules/vacated-orders (containing COVID-19-pandemic-related Standing Orders). Furthermore, although Mr. Gillard's speedy trial clock would have technically restarted as to any new charges against him in the Superseding Indictment, *see United States v. Komolafe*, 246 F. App'x 806, 809 (3d Cir. 2007) (explaining that superseding indictment commences new 70-day speedy trial period only when it adds "a new charge not identified in the criminal complaint or charged in the original indictment." (citing *United States v. Lattany*, 982 F.2d 866, 872 n.7 (3d Cir. 1992))), his clock would not have started to run because of the Court's complex-case designation.

### 1.    Mr. Gillard's Arguments

Mr. Gillard contends that "[t]he gross disparity in the evidence in this case weighs in favor of severance." Mem. of Law in Supp. of Def.'s Mot. for Severance Pursuant to Rule 14 of the Fed. R. Crim. P. at ECF p. 5. He claims that he was not the subject of law enforcement's investigation, his alleged involvement was minimal, and he had no contact with most of the Co-Defendants. *See id.* at ECF p. 6. He also claims that the bulk of the evidence the Government seeks to introduce pertains to his Co-Defendants and, as such, there is a risk that the evidence against them will spill over to his case, causing the jury to be incapable of differentiating his acts from those of his Co-Defendants. *See id.* at ECF pp. 5–6. He believes this potential prejudice supports severance of his charges. *See id.* at ECF p. 6.

Mr. Gillard also argues that this potential for prejudice outweighs the preference for joint trials. *See id.* He is unconcerned about any negative effect on judicial economy by a separate trial because he believes it would not be long or complex; rather, it "would likely require no more than a few days." *Id.* Overall, he asserts that "a joint trial would be highly prejudicial and damaging to [him]" because of "[t]he significant risk of spill-over evidence and juror confusion as to the issues and each co-defendants' [sic] culpability." *Id.* He believes that this "will leave this Court unable to meaningfully instruct the jury as to the limited admissibility of the evidence against [him]." *Id.* at ECF p. 7.

### 2.    The Government's Arguments in Opposition

The Government opposes Mr. Gillard's request for severance. *See* Omnibus Resp. at 12–19. It points out that contrary to Mr. Gillard's conclusory assertion about his minimal involvement in the alleged criminal activity, he was a "key member in [a] large scale [drug trafficking

organization]." *Id.* at 13. This was evidenced by the Superseding Indictment including 14 charges against him. *Id.*

Because the Superseding Indictment recognizes Mr. Gillard's significant role in the drug trafficking conspiracy charge, the Government argues that joinder is proper because the requirements of Federal Rule of Criminal Procedure 8(b), which governs joinder of charges, are satisfied here. *See id.* at 14. It further asserts that the Court should not exercise discretion to sever the charges because Mr. Gillard has failed to satisfy his "heavy burden" to show any actual prejudice from a joint trial and, even if he had made any showing of prejudice, a limiting instruction from the Court would mitigate any possible prejudice. *See id.* at 14, 17, 18. As for Mr. Gillard's spillover and juror confusion concerns, the Government notes that "any 'spillover' evidence [he] claims would prejudice him would relate to the conspiracy charged in the superseding indictment and would be admissible against [him]" at trial. *Id.* at 19. The Government contends that severing Mr. Gillard's charges from those of his Co-Defendants would force it "to present virtually the same exact evidence through the same witnesses two separate times before two different juries." *Id.*

### 3.    Applicable Law: Joinder and Severance of Criminal Charges

Regarding joint trials generally, "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."[37] Fed. R. Crim. P. 8(b). In addition,

> it is not enough that defendants are involved in offenses of the same or similar character; there must exist a transactional nexus in that the defendants must have

---

[37] A district court may also "order separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information." Fed. R. Crim. P. 13.

participated in "the same act or transaction, or in the same series of acts or transactions," before joinder of defendants in a multiple-defendant trial is proper.

*United States v. Walker*, 657 F.3d 160, 169 (3d Cir. 2011) (quoting *United States v. Jimenez*, 513 F.3d 62, 82–83 (3d Cir. 2008)). When considering whether joinder is proper, district courts may look beyond the face of the indictments to other pretrial documents that "clarify factual connections between the counts." *United States v. McGill*, 964 F.2d 222, 242 (3d Cir. 1992).

Additionally, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537–38 (1993). These joint trials "promote economy of judicial and prosecutorial resources." *United States v. Gorecki*, 813 F.2d 40, 42 (3d Cir. 1987) (citing *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980)).

Despite this preference for joint trials, a district court may "separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). A district court has "sound discretion" to sever charges in a criminal case. *See Zafiro*, 506 U.S. at 538–39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."); *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981) ("Motions for severance rest in the sound discretion of the trial judge, whose determination should not be disturbed in the absence of an abuse of discretion." (citation omitted)).

If the government has properly joined defendants under Rule 8,

> a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was

guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.

*Zafiro*, 506 U.S. at 539 (citation omitted).

### 4.    Analysis

Mr. Gillard has not demonstrated that severing his charges from his Co-Defendants is warranted. Although he does not address whether the charges are properly joined in his Motion, the Court finds that the Government has properly joined the charges because at least Mr. Gillard, Jackson, and Maxwell are alleged to have "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."[38] Fed. R. Crim. P. 8(b). In this regard, the Superseding Indictment describes in detail how Defendants' drug trafficking organization distributed several types of illegal drugs, with Mr. Gillard participating in the distribution of PCP, cocaine, crack, and heroin, and possessing a firearm in furtherance of drug trafficking. Accordingly, the joinder of Mr. Gillard's case with his Co-Defendants' cases is proper.

Although joinder may be permitted, it is not mandatory, and the Court still has discretion over whether to consolidate or sever the cases. *See United States v. Weber*, 437 F.2d 327, 331 (3d Cir. 1970) (explaining that trial courts have "wide discretion to consolidate indictments" and defendant attempting to show trial court erred in failing to sever charges "must make an affirmative showing that the [trial court] abused its discretion"). Here, there are no grounds warranting severance because Mr. Gillard has failed to make any plausible showing of possible prejudice. *See* Fed. R. Crim. P. 14(a) (allowing severance if consolidation appears to prejudice defendant). At best, Mr. Gillard's claims of prejudice are conclusory and speculative, and he has not demonstrated

---

[38] Jackson and Maxwell are referenced here because they are the only other Co-Defendants charged with conspiring to drug traffic several illegal narcotics along with Mr. Gillard who have not already pleaded guilty.

that "there is a serious risk that a joint trial would compromise a specific trial right of [his], or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

To the extent that Mr. Gillard's claims a risk of prejudice from "spillover" evidence presented against his Co-Defendants, he has still failed to show severance is proper here. An inquiry into prejudice from "spillover" evidence "hinges upon 'whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility.'" *Walker*, 657 F.3d at 170 (quoting *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005)). Contrary to Mr. Gillard's contentions, there is little concern that the jury will be unable to compartmentalize the evidence as it relates to all Defendants. Even if this case is complex, as this Court previously designated, *see* ECF No. 61, the charges are "relatively straightforward and discrete." *Id.* (quoting *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005)). Mr. Gillard's alleged role in the overarching conspiracy is specified in the Superseding Indictment, and the facts relating to the charges against each Defendant are readily distinguishable. Furthermore, with the exception of the charges and allegations against Ms. Gillard, which predominate the Superseding Indictment by far, Mr. Gillard is facing the most charges of any other Defendant. So, his assertion that his alleged involvement is "minimal," and less than his Co-Defendants, strains credulity. Accordingly, the risk of prejudice to Mr. Gillard in a joint trial is nominal at best.

Furthermore, to the extent that there was any possible prejudice to Mr. Gillard, the Court can mitigate it through jury instructions giving separate consideration to each charge against each Defendant. There is no indication at this time that the jury will be unable to follow these instructions and compartmentalize the evidence against each Defendants. *See United States v. Savage*, Crim. A. Nos. 07-00550-03, 07-00550-04, 07-00550-05, 07-00550-06, 2012 WL

6609425, at *7 (E.D. Pa. Dec. 19, 2012) ("This is not a case in which the jury will be unable to compartmentalize the evidence against each Defendant. While the Indictment describes 140 overt acts, the allegations in the Indictment with respect to each Defendant are clear."), *aff'd*, 85 F.4th 102 (3d Cir. 2023); *see also United States v. Urso*, 369 F. Supp. 2d 254, 269–70 (E.D.N.Y. 2005) (concluding that while joint trial involving six defendants, four murder allegations, and numerous racketeering offenses, could be "quite lengthy," "a joint trial of these defendants is more consistent with the fair administration of justice than would be a division of these defendants"); *United States v. Edelin*, 118 F. Supp. 2d 36, 44 (D.D.C. 2000) (finding that even though the case involved capital and non-capital defendants, it was "not so complex that a jury could not compartmentalize the evidence presented to it"). Instead, this Court "presume[s] that the jury follows such [cautionary] instructions, and regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant." *United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005) (internal citation omitted).

In conclusion, the Court finds that public interest in the judicial economy of a joint trial outweighs any potential for prejudice to Mr. Gillard being associated with the charges and evidence against his Co-Defendants. A joint trial "generally serve[s] the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability— advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *see also United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) (rejecting appellant's argument that joint trial prejudiced him since "much, if not all, of this [conspiracy] evidence could have been presented against [defendant] had the trials been severed," and because district court instructed jury to "give

separate individual consideration to each charge against each defendant"). Furthermore, the Court is confident that the jury will be capable of following a limiting instruction and compartmentalizing the evidence when it comes to Mr. Gillard and his Co-Defendants. Accordingly, Mr. Gillard's Motion to Sever will be denied.

### E.    Mr. Gillard's Motion to Suppress Physical Evidence Pursuant to Search Warrant (ECF Nos. 169, 176)

Mr. Gillard has moved to have the Court suppress evidence seized during a search of his residence at 3006 Tulip Street in Philadelphia (the "Residence") that occurred on January 25, 2023, pursuant to a search warrant. *See* ECF Nos. 169, 176. This Motion will be denied.[39]

### 1.    Mr. Gillard's Arguments

Mr. Gillard argues that the Court should suppress the evidence seized from the Residence because the affidavit in support of the warrant lacked sufficient probable cause insofar as (1) it lacked sufficient information to show a fair probability that evidence of criminal activity would be found in the Residence, and (2) the information in the affidavit was stale at the time of the search. *See* Mot. to Suppress Fruits of Search at 3006 Tulip Street and Mem. of Law in Supp. ("Mot. to Suppress Residence Search") at ECF p. 3, ECF No. 176. Regarding the alleged lack of probable cause in the affidavit, Mr. Gillard asserts that

> [the] affidavit did not contain sufficient probable cause for a detached neutral magistrate to issue the search warrant for Mr. Gillard's home. Ms. Gillard would enter 3006 Tulip, and once inside she was out of sight. The police did not know if Ms. Gillard had controlled substances on her person before entering the house. And they never saw her with them when she left the house. The officers drew a conclusion, unsupported by objective evidence, that since she sold drugs to the confidential informant after she left the house, that she must have gotten the drugs

---

[39] Mr. Gillard filed the same motion twice, with the latter motion attaching the challenged search warrant. *Compare* ECF No. 169, *with* ECF No. 176. The initial Motion (ECF No. 169) will be denied as moot. Additionally, the Motion to Suppress also contained a Motion to Join in Co-Defendants' Pretrial Motions. *See* ECF No. 176 at ECF p. 5. This joinder motion will also be denied.

from inside the house. That supposition, not backed by objective proof, does not equal probable cause.

*Id.* at ECF pp. 3–4.

Concerning staleness, Mr. Gillard indicates that Ms. Gillard's first sale with a confidential informant occurred in August 2022. *See id.* at ECF p. 4. The second controlled purchase did not occur until December 2022, four months later. *See id.* at ECF pp. 4–5. The final controlled purchase occurred in January 2023. *See id.* at ECF p. 5. He asserts that other than these three controlled purchases from Ms. Gillard, the affidavit did not include any other connections between drug trafficking and his residence. *See id.* Overall, he argues that three alleged drug purchases over five months does not establish probable cause to search the Residence, which occurred two weeks after the last alleged controlled purchase. *See id.*

### 2.     The Government's Arguments in Response

The Government contends that the affidavit of probable cause in support of the search warrant for the Residence "is long, and it sets forth a great deal of evidence concerning the drug trafficking activity of Phillip Gillard, and . . . [Ms. Gillard], and that the residence was used to facilitate narcotic trafficking activity." Omnibus Resp. at 6–7. This evidence included controlled purchases of narcotics from Mr. Gillard's residence on August 9, 2022, December 1, 2022, and January 6, 2023. *See id.* at 8. The Government asserts that this evidence provided the neutral, detached Magistrate Judge with sufficient information to show "ample probability" that law enforcement would find evidence of criminal activity at the Residence. *See id.* at 8. Thus, the Magistrate Judge had a substantial basis to find probable cause. *See id.* at 9.

As for Mr. Gillard's staleness argument, the Government maintains that the information in the affidavit was not stale because it was part of a series of continuing offenses that occurred over the course of a lengthy investigation. *See id.* at 8. In addition, the affidavit stated that a controlled

purchase occurred just two weeks prior to the issuance of the warrant. *See id.* The Government believes that the totality of this information gave the Magistrate Judge a substantial basis to conclude that the information was not stale. *See id.*

The Government also asserts that even if the Court were to conclude that the affidavit lacked a sufficient showing of probable cause, excluding the evidence seized during the search of the Residence is not automatic. *See id.* at 9 (citations omitted). Instead, exclusion would only be proper if the law enforcement officers conducting the search knew or were charged with knowing that the search was unconstitutional, and the Government indicates that there is no evidence in the record to support such a conclusion. *See id.* Therefore, the evidence seized at the Residence would still be admissible because the officers relied on the search warrant in good faith. *See id.* at 9–10.

### 3.   Analysis

United States Magistrate Judge Lynne A. Sitarski, who issued the warrant for the search of the Residence on January 20, 2023, had a substantial basis for finding probable cause. FBI Special Agent Colin Walsh ("SA Walsh") applied for the search warrant and supplied the information in the supporting affidavit. *See* Gov't Ex. 18. He described his background, which included his extensive involvement and training in, *inter alia*, narcotics investigations, as follows:

> 2.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), Philadelphia Field Division and have been employed as an SA since August of 2021. I have been an employee of the FBI since 2016, serving in various administrative roles in the FBI Baltimore Field Office, FBI Headquarters, and FBI Washington Field Office. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA")/Safe Streets Violent Drug Gang Task Force ("SSVDGTF") of the Philadelphia Division, which investigates, among other violations of federal law, violent drug gangs and criminal organizations including those involved in the importation, distribution and manufacturing of controlled substances, Hobbs Act violations, outlaw motorcycle gangs, and homicides and shootings resulting from the drug trade. I am a member of the FBI Gangs and Criminal Enterprise Program. As part of this program, I review state and local arrests for drugs and firearms violations and refer these cases to the United States Attorney's Office for possible federal prosecution. I have received specialized

training from the FBI, including training in the investigation and identification of narcotics traffickers and violent gangs.

       3.      Through my employment with the FBI, I have personally participated in the investigations of firearms violations, drug violations, and other related crimes. I have participated in debriefings of defendants, informants, and witnesses who had personal knowledge regarding major drug trafficking organizations. I have participated in narcotics investigations to include physical and electronic surveillance, controlled narcotics purchases, Title-III wiretap investigations, analyzing telephone toll records, handling of confidential sources, and the execution of search warrants.

       4.      I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code and other related offenses.

       5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement personnel, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

*Id.*, Aff. in Supp. of Appl. at 1–3.

       After providing this background, SA Walsh set forth the following averments pertaining to

probable cause:

       6.      This application is submitted in support of an FBI investigation into a violent drug trafficking organization referred to as the Gillard Street Gang (GSG), believed to operate primarily in the Kensington and Port Richmond sections of Philadelphia within the Eastern District of Pennsylvania. The United States, including the FBI, is conducting a criminal investigation of the drug trafficking organization regarding possible violations of 21 U.S.C. § 841(a)(1) & 846. Specifically, P. GILLARD and D. GILLARD are suspected of distributing large quantities of Phencyclidine (PCP). During this investigation the FBI conducted numerous controlled purchase operations of PCP from D. GILLARD and P. GILLARD involving the SUBJECT PREMISES.

       7.      On August 9, 2022, investigators utilized a Confidential Human Source (CHS) to conduct a controlled narcotics purchase of approximately 64 ounces of a gold-colored liquid which was tested at the Philadelphia Chemical

Laboratory and was determined to be liquid Phencyclidine (PCP).[40] The CHS purchased the PCP for $6,000 from GSG member DIANE GILLARD in the Port Richmond neighborhood of Philadelphia, on the 2900 block of Tulip Street. The CHS obtained audio and video recordings of the controlled purchase. Investigators monitored a live audio transmission, a live video transmission, and conducted physical surveillance of the purchase. The CHS and his/her vehicle were searched by investigators before and after the controlled purchase for undisclosed drugs, cash, and contraband with negative results. The following details of the purchase were determined through a combination of a debrief of the CHS post purchase, monitoring the live audio and video transmissions, physical surveillance, and review of recorded audio and video of the buy.

8.      On August 9, 2022, CHS ordered a half gallon of PCP from D. GILLARD. Surveillance was established at 2900 Tulip Street as well as the SUBJECT PREMISES. At approximately 11:12AM, a black Chevrolet Silverado parked on the 3000 block of Tulip Street. PHILLIP GILLARD exited the driver side door of the black Silverado and then entered the front door of SUBJECT PREMISES using a key.

9.      Investigators followed the CHS from a staging location to the 2900 block of Tulip Street. At approximately 11:17AM, The CHS parked on the 2900 block of Tulip Street and placed a telephone call to D. GILLARD to advise he/she had arrived. D. GILLARD was observed on foot in the area. At 11:21 AM, D. GILLARD entered the front door of SUBJECT PREMISES with no noticeable items in her hands or pockets. A short time later, D. GILLARD exited the front door of SUBJECT PREMISES with a large bulge in her right front pants pocket. After exiting SUBJECT PREMISES, D. GILLARD placed a telephone call to the CHS stating, she was going to get an extra bag to make sure the bottle did not leak. At 11:26 AM, D. GILLARD entered the front passenger seat of the CHS' vehicle and handed a grey plastic bag to the CHS. The CHS handed D. GILLARD a brown paper bag containing $6,000. At 11:30 AM, D. GILLARD exited the CHS' vehicle carrying a brown paper bag, walked north on Tulip Street, and east on Ann Street. The CHS left the area north on Tulip Street and was followed out of the area by investigators to a staging location.

10.      D. GILLARD walked to a grey Chevrolet sedan and entered the passenger side door with the brown bag. D. GILLARD exited the vehicle a short time later holding United States Currency (USC). D. GILLARD counted the USC before placing it in her pants pocket. D. GILLARD then walked west on Ann Street.

---

[40] CHS's criminal history includes two prior convictions for possession of narcotics with intent to distribute, both of which are over 15 years old. CHS first began to cooperate with law enforcement after being approached by officers as a potential target of a drug distribution investigation being conducted by the FBI. Ultimately, CHS was not charged in that case. The FBI has compensated CHS financially in exchange for CHS's cooperation. CHS's information has proven to be reliable, truthful, and verifiable.

At 11:34 AM, D GILLARD walked up to SUBJECT PREMISES and knocked on the door. The door opened from the inside and D GILLARD entered the SUBJECT PREMISES.

11.     The CHS met with agents at the staging location and turned over a grey plastic bag containing a plastic bottle with a yellow lid marked "ICEY TEA." The bottle contained a goldcolored liquid with a strong chemical odor later determined to be PCP.

12.     On December 1, 2022, investigators utilized the CHS to conduct a controlled narcotics purchase of approximately 64 ounces of a gold-colored liquid which was tested at the Philadelphia Chemical Laboratory and was determined to be 1.51 kilograms of liquid PCP. The CHS purchased the PCP for $5,000 from D. GILLARD in the Port Richmond neighborhood of Philadelphia, on the 2900 block of Tulip Street. The CHS obtained audio and video recordings of the controlled purchase. Investigators monitored a live audio transmission, a live video transmission, and conducted physical surveillance of the purchase. The CHS and his/her vehicle were searched by investigators before and after the controlled purchase for undisclosed drugs, cash, and contraband with negative results. The following details of the purchase were determined through a combination of a debrief of the CHS post purchase, monitoring the live audio and video transmissions, physical surveillance, and review of recorded audio and video of the buy.

13.     At 12:43 PM, the CHS had telephonic contact with D GILLARD and arranged the purchase of PCP. Investigators then followed the CHS to the 2900 block of Tulip Street. At 1:03 PM, the CHS parked on the 2900 block of Tulip Street and sent a text message to D. GILLARD stating, "I'm on the block." D. GILLARD replied, "Ok waiting for him to pull up." At 1:58 PM, a black Chevrolet Silverado parked on Ann Street just west of Tulip Street. P. GILLARD exited the driver seat of the black Silverado. P. GILLARD was carrying a black bag with handles with the words "Thank You for Shopping Here" written in white lettering. P. GILLARD entered the front door of SUBJECT PREMISES using a key.

14.     At 2:07 PM, a white Mercury Sable double parked in front of SUBJECT PREMISES. D. GILLARD exited the front passenger seat of the Mercury and walked toward the front door of SUBJECT PREMISES. D. GILLARD knocked on the front door of SUBJECT PREMISES and entered the residence. A short time later, D .GILLARD exited the front door of SUBJECT PREMISES and re-entered the white Mercury. D. GILLARD appeared to be concealing a large item in her front hooded sweatshirt pocket. At 2:10 PM, the white Mercury departed and was followed out of the area. The white Mercury circled the block and parked on the 2900 block of Tulip Street in front of the CHS' vehicle. At approximately 2:14 PM, D. GILLARD exited the front passenger seat of the white Mercury and entered the front passenger seat of the CHS' vehicle. D. GILLARD handed the CHS a black cloth bag and the CHS handed D. GILLARD

28

a brown paper bag containing $6,000. D. GILLARD advised the CHS to keep $1,000. At approximately 2:18 PM, D. GILLARD exited the CHS' vehicle and reentered the Mercury. The CHS departed the area and was followed by investigators to the staging area. Once at the staging area, the CHS met with investigators and turned over a black cloth bag with handles with the words "Thank You for Shopping Here" written in white lettering. The black bag contained a plastic bottle labeled "ICY Lemonade" containing a gold-colored liquid with a strong chemical odor believed to be PCP. At 3:03 PM, P GILLARD exited the front door of SUBJECT PREMISES.

15.     On January 6, 2023, investigators utilized the CHS to conduct a controlled narcotics purchase of approximately 64 ounces of a gold-colored liquid with a strong chemical smell resembling PCP. The CHS purchased the suspected PCP for $6,000 from D. GILLARD in the Port Richmond neighborhood of Philadelphia, on the 2900 block of Tulip Street. The CHS obtained audio and video recordings of the controlled purchase. Investigators monitored a live audio transmission, a live video transmission, and conducted physical surveillance of the purchase. The CHS and his/her vehicle were searched by investigators before and after the controlled purchase for undisclosed drugs, cash, and contraband with negative results. The following details of the purchase were determined through a combination of a debrief of the CHS post purchase, monitoring the live audio and video transmissions, physical surveillance, and review of recorded audio and video of the buy.

16.     At 11:33 AM, on January 6, 2023, the CHS had telephonic contact with D. GILLARD and arranged the purchase of PCP. Investigators then followed the CHS to the 2900 block of Tulip Street. At 12:10 PM, the CHS parked on the 2900 block of Tulip Street. The CHS made multiple calls to D. GILLARD, inquiring about when the PCP would be delivered. At approximately 1:06 PM, the CHS placed a telephone call to D. GILLARD to ask for an update. D. GILLARD advised the CHS that she would get the PCP soon. At 1:20 PM, D. GILLARD walked west on Ann Street carrying an empty plastic bottle and entered a grey Jeep. At 1:22 PM a black Chevrolet Silverado parked on Tulip Street near the intersection of Clearfield Street. P. GILLARD exited the driver's seat of the black Silverado and approached the SUBJECT PREMISES. D. GILLARD exited the grey Jeep and met P GILLARD at the front door of SUBJECT PREMISES. At approximately 1:24 PM, P. GILLARD used a key to open the front door, and both P. GILLARD and D. GILLARD entered the SUBJECT PREMISES. At 1:28 PM, D. GILLARD exited the residence carrying a black bag with a heavy object in it. D. GILLARD entered the front passenger seat of the grey Jeep and departed. Investigators followed the grey Jeep and maintained visual contact of the Jeep from its departure until its next stop.

17.     At 1:34 PM, the grey Jeep parked behind the CHS's vehicle on the 2900 block of Tulip Street. D. GILLARD exited the grey Jeep with the heavy black bag and opened the front passenger door of the CHS's vehicle. D. GILLARD gave

the CHS the black bag, which contained a plastic "ICY Lemonade" bottle that contained liquid PCP. In return for the suspected PCP, the CHS gave D. GILLARD a brown paper bag containing $6,000 of controlled narcotics purchase money. At approximately 1:36 PM, D. GILLARD closed the front passenger door of the CHS's vehicle and walked away with the brown paper bag containing the controlled narcotics purchase money. D. GILLARD entered the Jeep and departed. The CHS was followed back to the staging location, where the CHS handed over the PCP.

18.     The preceding facts show that P. GILLARD and D. GILLARD have engaged in narcotics trafficking in the Philadelphia area and that SUBJECT PREMISES has been and continues to be utilized to facilitate that narcotics trafficking. Law enforcement believes that SUBJECT PREMISES is used to store PCP and possibly other narcotics.

## BACKGROUND ON DRUG MANUFACTURING AND TRAFFICKING

19.     Based upon my training, experience, and participation in this and other investigations involving distribution of narcotics, my conversations with other experienced investigators and law enforcement agents with whom I work, and interviews of individuals who have been involved in the trafficking of illegal narcotics, I have learned and know the following:

20.     It is common for drug dealers to possess drugs, drug paraphernalia, and other items which are associated with the importation, manufacture, sale, and use of controlled substances, such as scales, containers, funnels, cutting agents, postage labels, postage receipts, and packaging materials in their residences and vehicles.

21.     It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the residences and vehicles of those involved in the suspected illegal activity. Items of personal property that tend to identify the person in residence, occupancy, control, or ownership of the SUBJECT PREMISES also include canceled mail, deeds, leases, rental agreements, photographs, personnel telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental receipts and property ownership papers, personnel and business telephone and address books and telephone toll records; and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

22.     It is common for narcotics traffickers to hide proceeds of illegal drug sales and records of illegal drug transactions in secure locations within their residences for their ready access and to conceal them from law enforcement.

23.     Individuals involved in narcotics trafficking can amass significant proceeds from the illegal sale of narcotics, which they then attempt to legitimize. To accomplish these goals, drug traffickers utilize financial institutions and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, real estate, shell operations, and business fronts. Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference, including Federal and State tax records, loan records, mortgages, deeds, titles, certificates of ownership, records regarding investments and securities, safe deposit box rental records and keys, and photographs. I know from my training and experience that often items of value are concealed by persons involved in large scale drug trafficking inside of safes, lock boxes, and other secure locations within their residences, outbuildings, and vehicles.

24.     Drug traffickers often place assets in names other than their own to avoid detection of these assets by government agencies, and that even though these assets are in other individual or business names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

25.     Unexplained wealth is probative evidence of crimes motivated by greed, in particular, illegal trafficking in drugs.

26.     Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their product. Drug traffickers usually maintain these photographs or videos in their possession or located on their cellular devices or computers, which they keep in their residences.

27.     Drug manufactures and traffickers must maintain large amounts of United States currency in order to maintain and finance their on-going illegal narcotics business.

28.     Drug traffickers who operate on the internet are often in the possession of large quantities of digital currency which represents their illicit proceeds immediately following the sale of narcotics on the dark net. Digital currency hardware wallets, offline storage devices as well as handwritten, account numbers, seed recovery passwords and mnemonic passphrases are generally located inside of safes, lock boxes, and other secure locations within their residences, outbuildings, and vehicles.

29.     Drug traffickers utilize mobile electronic devices including cellular telephones and other wireless communication devices for the purpose of maintaining their illegal trafficking business. Such equipment often contains evidence of these illegal activities.

30.     Drug traffickers commonly have in their possession, that is, on their person, and/or at their residences, firearms, and other weapons, which are used to protect and secure their property.

31.     Manufacturers, importers, and distributors of narcotics frequently try to conceal their identities by using fraudulent names and identification cards. Once identities have been created or stolen from other citizens, drug traffickers use those identifications to falsify records such as Department of Motor Vehicle and phone records for the purpose of theft of services and to evade detection by law enforcement.

32.     It is a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences and businesses. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" these items from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. These records include "pay and owe" records to show balances due for drugs sold in the past (pay) and for payments expected (owe) as to the trafficker's suppliers and distributors, telephone and address listings of clients and suppliers, and records of drug proceeds. These records are commonly kept for an extended period of time.

33.     Drug traffickers commonly maintain books, records, receipts, notes, parcel tracking numbers, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, and distribution of controlled substances. These documents whether in physical or electronic form, are maintained where the traffickers have ready access to them. These documents include travel records, receipts, airline tickets, auto rental agreements, invoices, and other memorandum disclosing acquisition of assets and personnel or business expenses. I also know that the most promising place to find such items is within drug traffickers' residences[.]

34.     Drug traffickers who utilized the dark net will maintain security codes, seed recovery, passphrases, encryption keys and their passwords for their online personas as well as for their digital currency accounts and offline storage mediums which are used to access and safely store their proceeds which are initially in the form of digital currency.

35.     Evidence of illegal trafficking of controlled substances and money laundering, such as the items described above, is likely to be found where the dealers live even if the distribution or transaction did not occur at the residence. Moreover, individuals involved in large, long-term drug trafficking organizations typically maintain such evidence for an extended period of time.

> 36.    Latent fingerprints and palm prints are frequently found in drug traffickers' residences and vehicles, and can be evidence of dominion, control, and possession of those residences and vehicles.

*Id.* at 3–12 (footnote in original).[41]

As shown above, there is ample evidence identified in SA Walsh's affidavit establishing that "there is a fair probability that contraband or evidence of a crime will be found" at the Residence. *Gates*, 462 U.S. at 238. The affidavit states, *inter alia*, that the FBI was investigating a violent drug trafficking organization, Mr. Gillard and Ms. Gillard were suspected of distributing large amounts of PCP, and the FBI conducted controlled purchases of PCP from the Residence. *See* Warrant, Aff. in Supp. of Appl. at 3, 8. The affidavit goes on to describe three controlled purchases of PCP using a Confidential Human Source ("CHS"). *See id.* at 3–8.[42] These controlled purchases occurred on August 9, 2022, December 1, 2022, and January 6, 2023. *See id.*

For the August 9, 2022 controlled purchase, the CHS had ordered a half gallon of PCP from Ms. Gillard. *See id.* at 4. Law enforcement later observed Mr. Gillard enter the Residence approximately ten minutes prior to Ms. Gillard doing so. *See id.* When Ms. Gillard entered the Residence, law enforcement observed that she had "no noticeable items in her hands or pockets." *Id.* Shortly thereafter, Ms. Gillard exited the Residence with "a large bulge in her right front pants pocket." *Id.* She then told the CHS that she was going to get an extra bag to ensure the bottle did not leak. *See id.* Ultimately, in exchange for $6,000, she handed a bag to the CHS which was later determined to contain a bottle of PCP. *See id.* at 4–5. After receiving the $6,000, she returned to

---

[41] The footnote in the affidavit has been renumbered to correspond to the other footnotes in this memorandum opinion.

[42] Contrary to Mr. Gillard's argument in his quasi-*pro se* Motion to Suppress (ECF No. 163), Agent Walsh provided specific details about the CHS and their involvement in the investigation, as well as vouched for their reliability, truthfulness, and verifiability. *See id.* at 3 n.1.

the Residence, knocked on the door, and reentered the Residence via someone inside of it opening the door for her. *See id.* at 5.

Concerning the December 1, 2023 controlled purchase, the CHS again arranged to purchase PCP from Ms. Gillard. *See id.* at 6. After the CHS notified Ms. Gillard that they were nearby, she informed the CHS that she was "waiting for him to pull up." *Id.* Approximately an hour later, Mr. Gillard arrived and was carrying "a black bag with handles with the words 'Thank You for Shopping Here.'" *Id.* He then entered the Residence using a key. *See id.* Approximately ten minutes after Mr. Gillard entered the Residence, Ms. Gillard arrived at the Residence, knocked on the door, and entered. *See id.* Shortly thereafter, she exited the residence and appeared to be concealing a large item in her front hooded sweatshirt pocket. *See id.* She later provided the CHS, in exchange for $5,000, a black bag similar to the one Mr. Gillard was carrying when he entered the Residence. *See id.* at 6–7. The bag contained a bottle with liquid law enforcement believed was PCP. *See id.* at 7.

As for the final controlled purchase identified in the affidavit, which occurred on January 6, 2023, the CHS contacted Ms. Gillard and arranged to purchase 64 ounces of PCP. *See id.* Later that day, Mr. and Ms. Gillard met at the Residence and entered it together. *See id.* at 8. Approximately four minutes later, Ms. Gillard exited the Residence with a black bag with a heavy object in it. *See id.* She then entered a vehicle, which law enforcement visually surveilled until it stopped near a vehicle the CHS was operating. *See id.* Ms. Gillard exited the vehicle and gave the CHS the black bag in exchange for $6,000. *See id.* The black bag contained liquid PCP. *See id.*

This information about the three controlled purchases in the affidavit sufficiently set forth "a fair probability" that evidence of narcotics trafficking would be found at the Residence.

Moreover, contrary to Mr. Gillard's assertion, the information in the affidavit of probable cause was not stale.

Stale information "may have little value in showing that contraband or evidence is likely to be found in the place for which the warrant is sought." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997).  However, the age of the evidence supporting a search warrant is but one factor in the probable cause calculus. *See United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) ("Age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. Age alone, however, does not determine staleness." (internal citations omitted)). Likewise, "[t]he mere lapse of time, even if it is a substantial lapse of time, is not controlling on a question of staleness." *United States v. Simmons*, Crim. A. No. 13-669, 2015 WL 13358206, at \*12 (E.D. Pa. Oct. 1, 2015) (citation omitted); *see United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) ("[The] mere lapse of substantial amounts of time is not controlling in a question of staleness."). Instead, determining whether there was probable cause that evidence of criminal activity is still in the place to be searched, "depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983) (citation omitted).

Within the context of an ongoing narcotics investigation, periods of weeks or even months between an act giving rise to probable cause and the warrant application do not necessarily render the information stale. *See id.* ("When an activity is of a protracted and continuous nature 'the passage of time becomes less significant[,'] and . . . 'protracted and continuous activity is inherent in a large[-]scale narcotics operation.'" (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972) and *United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973))); *see United States v.*

*Gallo*, 110 F. App'x 265, 268 (3d Cir. 2004) (referencing with approval district court's statement that "in investigations of ongoing narcotics operations intervals of weeks or months between the last described act and the warrant [do] not necessarily make the information stale" (alteration in original) (quoting Dist. Ct. Op. at 5)). There is a "reasonable inference . . . that drug dealers often store evidence of drug crimes in their residences." *Stearn*, 597 F.3d at 559 (citing *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002)). This reasonable inference is "based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities." *Burton*, 288 F.3d at 104. In other words, "a magistrate may infer probable cause to search [a] drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation." *Stearn*, 597 F.3d at 560.

In the instant case, Agent Walsh and Magistrate Judge Sitarski both concluded that evidence of drug trafficking was likely to be found in the Residence at the time of the search. They based this reasonable inference on three controlled purchases which implicated Mr. Gillard as a drug dealer and demonstrated his association with Ms. Gillard, who supplied the PCP to the CHS in the controlled purchases. The affidavit also described video surveillance showing Mr. Gillard carrying a bag into the Residence that Ms. Gillard later used to deliver PCP to the CHS. At bottom, this evidence established a nexus between the Residence and the crimes under investigation, and neither the lapse of time between controlled purchases, nor the lapse of time between the last controlled purchase and obtaining the search warrant, rendered this nexus stale. *See, e.g.*, *United States v. Caple*, 403 F. App'x 656, 659 (3d Cir. 2010) ("We agree with the District Court that the information contained in the affidavit was not stale. The information in the affidavit indicated that

Caple had engaged in drug trafficking activity over a period of months, with the last controlled transaction taking place only weeks before the warrant was issued."); *Gallo*, 110 F. App'x at 267–68 (holding that evidence of drug dealing was not stale due to twenty-day interval between controlled buy and search of suspect's home).

Even if the Court were to find that the Magistrate Judge lacked a substantial basis for finding probable cause, exclusion of the seized evidence from the Residence would be inappropriate because law enforcement acted in good faith or in objective reasonable reliance on the search warrant, and Mr. Gillard has not argued or shown otherwise. In this regard, the Court points out that to "effectuate the Fourth Amendment right of all citizens to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" the Supreme Court adopted the exclusionary rule, which provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citations and internal quotation marks omitted). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.* (citations omitted).

Courts apply the exclusionary rule

"only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule" to ward against unreasonable searches and seizures by law enforcement. *United States v. Leon*, 468 U.S. 897, 918 (1984). Courts must perform a "rigorous" test to measure the "deterrence benefits of exclusion" against "substantial social costs." *Davis v. United States*, 564 U.S. 229, 237–38 (2011).

The good faith exception buttresses this test. The good faith exception prevents suppression of evidence when the executing officers acted in "good faith" or "objectively reasonable reliance" on a "subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. Thus, in instances where an officer acted illegally but "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment.... [the exclusionary rule] should not be applied[ ] to deter objectively reasonable law enforcement activity." *Id.* at 918-19. Further, the exclusionary rule

is only implemented when law enforcement conduct is "deliberate, reckless, or grossly negligent." *Herring v. United States*, 555 U.S. 135, 144 (2009).

Accordingly, the test to determine if the good faith exception applies is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999). "[A]ny defects in the warrant" and "the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known" are both evaluated by courts. *United States v. Franz*, 772 F.3d 134, 147 (3d Cir. 2014). Courts must recognize that law enforcement officers do not have an expert grip on the law and are not "expected to question the magistrate's probable-cause determination." *Leon*, 468 U.S. at 921. *See also Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986) ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." (internal quotation marks and citation omitted)).

There are four instances, however, where the good faith exception does not apply:

(1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

(3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).

*United States v. Henry*, No. 21-3254, 2023 WL 2770817, at *2–3 (3d Cir. Apr. 4, 2023) (internal footnote omitted) (alterations in original), *cert. denied*, 144 S. Ct. 208 (2023).

In this case, none of the exclusions to the good faith exception apply. There is no argument or evidence presented showing SA Walsh's affidavit of probable cause was (1) "deliberately or recklessly false," (2) "so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable," or (3) "so facially deficient that it failed to particularize the place to be searched or the things to be seized." *Id.* at *3 (quoting *Tracey*, 597 F.3d at 151). In addition, there is no evidence in the record, or argument from Mr. Gillard, that the Magistrate Judge "abandoned [her] . . . judicial role and failed to perform [her] . . . neutral and detached function." *Id.* (quoting *Tracey*, 597 F.3d at 151). Therefore, the good faith exception would apply even if the Court would have found that there was not a substantial basis for finding probable cause. Accordingly, Mr. Gillard's Motion to Suppress the items seized from the Residence is properly denied.

### F.    Mr. Gillard's Motion to Suppress Pole Camera Evidence (ECF No. 168)

Mr. Gillard moves for suppression of photographic and video evidence law enforcement obtained from pole cameras allegedly installed in the front and rear of his home. *See* Def.'s Mot. to Suppress Photographs and Video Evidence from Pole Cameras with Mem. of Law at ECF p. 2, ECF No. 168. This Motion will be denied.

### 1.    Mr. Gillard's Arguments

Mr. Gillard claims that law enforcement placed pole cameras to capture the front and rear of 3000 Tulip Street, and he points out that the Residence was located at 3006 Tulip Street. *See id.* He asserts that the pole cameras were placed at these locations without a warrant or court order, and the cameras stayed in place for 12 months. *See id.* He avers that he was subjected to round-the-clock surveillance, and the surveillance included video from the inside of his home. *See id.* at ECF pp. 2–5. He contends that he had a reasonable expectation of privacy in his home, which was protected by the Fourth Amendment, and he argues law enforcement violated his Fourth Amendment rights when they continuously recorded the inside and outside of his home for 12 months. *See id.* at 4–5.

### 2.    The Government's Arguments in Response

The Government has responded to this Motion by asserting that Mr. Gillard's identification of the location of one of the pole cameras is mistaken. *See* Omnibus Resp. at 22. It points out that although there were two pole cameras used in the investigation, only one of the cameras, located in the vicinity of the 2900 block of Tulip Street, could capture video of any portion of Mr. Gillard's home, and it could not look inside his home. *See id.* & Ex. C. Overall, the Government claims that Mr. Gillard "is confusing surveillance video taken by law enforcement with pole camera video." *Id.* As such, it requests that the Court deny the Motion.

### 3.    Analysis

During the evidentiary hearing, Attorney Chestnut addressed this Motion at the Court's request and appeared to acknowledge that he made a mistake concerning the origins of the video footage. However, he never stated that he had withdrawn the Motion. Nevertheless, this Motion will be denied because Mr. Gillard did not satisfy his initial burden to establish a basis for the Motion insofar as he failed to show that any pole camera could see inside the Residence.

### G.    Mr. Gillard's Motion to Exclude Cell Phone Evidence (ECF No. 167)

Mr. Gillard final motion, and the last of his *pro se* motions which Attorney Chestnut incorporated into counseled motions, moves to have the Court exclude evidence seized from a warrantless search of his cell phone. *See* Mot. to Exclude Cell Phone Evid. ("Phone Mot.") at ECF p. 5, ECF No. 167. This Motion will be denied.

1.      **Findings of Fact**[43]

Based on the evidence presented during the evidentiary hearing on December 12, 2023, and the exhibits submitted by the parties during and after the hearing, the Court makes the following findings of fact:

1.      FBI Special Agent William Becker ("SA Becker") has worked in law enforcement for approximately 15 years, and he has spent approximately the last seven years working for the FBI. He currently works out of the FBI's headquarters in Philadelphia, Pennsylvania.

2.      On January 24, 2023, the Grand Jury returned an indictment charging multiple defendants in this case. Federal judges later signed arrest warrants for those defendants.

3.      The arrests arose out of a lengthy investigation into the defendants' criminal activities.

4.      Over 100 law enforcement personnel were involved in the arrests of the defendants in this case.

5.      On January 25, 2023, most of the individuals charged in the indictment, including Mr. Gillard, were arrested and placed in custody at FBI Headquarters in Philadelphia.

6.      SA Becker was not present at the scene when Mr. Gillard was arrested. Rather, he was part of the law enforcement team who arrested Cesar Maldonado, one of Mr. Gillard's co-defendants.

7.      At the time of Mr. Gillard's arrest, law enforcement seized an Apple iPhone from him.

---

[43] "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d).

8.      At approximately 10:00 a.m. on January 25, 2023, SA Becker met with Mr. Gillard in an interview room/holding area at FBI Headquarters in Philadelphia.

9.      The interview room was fairly small and consisted of a table, a couple of chairs, a video camera on the wall, and a place to secure an arrestee such as Mr. Gillard.

10.     At the time SA Becker entered the interview room to speak to Mr. Gillard, Mr. Gillard was handcuffed to the table in the room.

11.     Law enforcement personnel offered Mr. Gillard something to eat and/or drink while he was in the interview room, which SA Becker explained was standard practice at the Philadelphia Headquarters.

12.     Mr. Gillard was calm and cordial.

13.     SA Becker explained that as part of the standard arrest operations, he and other members of the FBI/Task Force would introduce themselves to arrestees, provide them with a brief overview of the charges against them, and make them aware of the next steps in the case, such as their initial appearance before a Magistrate Judge.

14.     At 10:10 a.m., SA Becker read to Mr. Gillard his *Miranda* rights verbatim from the FBI's "Advice of Rights" form. This form states:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed to you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right
to stop answering at any time.

Gov't's Ex. 16.

15.     Just below the section of the form containing Mr. Gillard's *Miranda* rights is a
"Consent" section. *See id.* There is a blank signature line in this section, and just above it is the
following statement: "I have read this statement of my rights and I understand what my rights are.
At this time, I am willing to answer questions without a lawyer present." *Id.* Mr. Gillard signed his
name on the signature line in this section at 10:11 a.m., which was witnessed by SA Becker and
his partner, Task Force Officer William Schlosser ("TFO Schlosser"), who was also in the
interview room with Mr. Gillard.

16.     Mr. Gillard indicated a willingness to speak to them.

17.     Despite Mr. Gillard having indicated a willingness to speak to SA Becker and TFO
Schlosser, he never told them any information about the investigation.

18.     SA Becker indicated that it was not unusual for an arrestee to sign the consent
section indicating that they were willing to answer questions without a lawyer present, and then
never actually answering any substantive questions from law enforcement.

19.     SA Becker asked Mr. Gillard whether he would consent to law enforcement
searching the iPhone which was seized at the time of his arrest.

20.     SA Becker does not recall exactly what he said to Mr. Gillard about obtaining
consent to search the phone.[44]

---

[44] On direct examination, SA Becker testified that he believes that he and TFO Schlosser explained
to Mr. Gillard that they had recovered his phone and they would either apply for a search warrant
or ask for his consent to search. He also believed that he explained to Mr. Gillard that it would
save them some paperwork if he consented to the search of his phone.
    Then, on cross examination, SA Becker appeared to testify that he believed he told Mr.
Gillard something to the effect of: "You can either consent to the search and save me some

21.     Mr. Gillard consented, verbally and in writing, to a search of his phone.

22.     Mr. Gillard signed the bottom of an FD-26 "Consent to Search" form for his cell phone. The form stated:

1.   I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of: I Phone [sic] 6 . . .

2.   I have been advised of my right to refuse consent.

3.   I give this permission voluntarily.

4.   I authorize these agents to take any items which they determine may be related to their investigation.

Gov't's Ex. 16. SA Becker and TFO Schlosser signed just below Mr. Gillard's signature as witnesses to the signature. *See id.*

23.     On the FD-26 "Consent to Search" form, SA Becker or TFO Schlosser handwrote the make and model for Mr. Gillard's phone, as well as the password after Mr. Gillard had provided it to them. *See id.*

24.     SA Becker advised Mr. Gillard of his right not to consent to a search of his phone.

25.     Although the interview room had a video camera to record video and audio from the room, there is no video evidence of SA Becker and TFO Schlosser's meeting with Mr. Gillard on January 25, 2023, due to a technological error when copying the interview recording onto a disc.

---

paperwork, or I can file for a search warrant with the court and then search your phone." SA Becker appeared to agree that he was essentially stating to Mr. Gillard that no matter what he decided to do, a search of the phone was going to happen.

26.     SA Walsh and Special Agent Joseph R. Wolfley completed an FBI FD-302 Form which related to, *inter alia*, what occurred in the interview room between Mr. Gillard, SA Becker, and TFO Schlosser. *See* Gov't's Ex. 17. This FBI FD-302 states in pertinent part:

> GILLARD was advised of the charges against him and signed an FD-395 "Advice of Rights" form. GILLARD also signed an FD-26 "Consent to Search" form for his cell phone, an Apple iPhone 6 with the telephone number . . . . GILLARD provided the passcode . . . to access the phone.

*Id.*

27.     SA Becker is aware that law enforcement cannot search an arrestee's phone simply because it was seized at the time of the arrestee's arrest.

28.     SA Becker obtained consents to search from co-defendants Cesar Maldonado and Raphael Sanchez. SA Becker did not recall the exact words he used, but he believes he told them that law enforcement would be getting a search warrant for their phones, but if they consented their cooperation would be made known to the judge. SA Becker does not recall whether he made a similar statement to Mr. Gillard.

29.     Although it was his common practice to ask arrestees if there were any numbers on their cell phone that they needed to copy to take with them to the Federal Detention Center, he did not recall whether he asked this question to Mr. Gillard.

30.     In situations where arrestees indicate that they want to obtain phone numbers from the phone, the arrestee will tell SA Becker (or another law enforcement officer) their phone's passcode, and the officer will enter that into the phone to unlock it so the arrestee can obtain the phone numbers.

31.     SA Becker believes his interactions with Mr. Gillard in the interview room were amicable and cordial.

32.     Neither SA Becker nor TFO Schlosser threatened Mr. Gillard in any way while in the interview room with him.

### 2.     Applicable Law – Consent to Conduct Warrantless Search

Regarding warrantless searches pursuant to voluntary consent:

> Under the Fourth Amendment, a warrantless search or seizure is lawful when done pursuant to valid, voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government carries the burden of proving by a preponderance of the evidence that a person's consent was the product of an "essentially free and unconstrained choice by its maker." *Id.* at 222, 225, 93 S.Ct. 2041; *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989). "There is no talismanic definition of voluntariness, mechanically applicable to the host of situations where the question has arisen." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (citing *Schneckloth*, 412 U.S. at 224, 93 S.Ct. 2041) (cleaned up). Instead, courts consider the totality of circumstances, with no single factor or criterion controlling. *Id.* Such factors include: 1) the age, education, and intelligence of the accused, 2) whether the suspect was read his constitutional rights, 3) the length of the police encounter, 4) the repetition or duration of the questioning, and 5) the use of any physical punishment or coercion. *Id.*
>
> If a law enforcement agent makes false statements or misrepresentations to induce consent, even if those falsehoods are innocently made, then an even heavier burden is placed on the government to prove voluntary consent. *See United States v. Molt*, 589 F.2d 1247, 1251-52 (3d Cir. 1978) ("When evidence exists to show [ ] that a defendant believed he must consent such evidence weighs heavily against a finding that consent was voluntarily given. And when that belief stems directly from misrepresentations by government agents, however innocently we made, we deem the consent even more questionable."); *United States v. Sebetich*, 776 F.2d 412, 424 (3d Cir. 1985) (explaining that a government agent's misrepresentations do not "necessarily vitiate[ ]" voluntariness, but that the government will carry "an especially heavy burden" to prove consent in such cases).

*United States v. Adams*, 637 F. Supp. 3d 282, 289–90 (E.D. Pa. Oct. 28, 2022) (alterations in original).

### 3.     Mr. Gillard's Arguments in His Original Motion to Suppress

In his original Motion, Mr. Gillard argues that the FBI conducted an unlawful, warrantless search of his cell phone in two respects. *See* Phone Mot. at ECF pp. 5–6. First, he claims that there were no exigent circumstances that would have supported a warrantless search of the phone. *See*

*id.* Second, he asserts that he never provided verbal or written consent to search his phone. *See id.* at ECF p. 5.

### 4. The Government's Response in Opposition to Mr. Gillard's Original Motion to Suppress

The Government contends that the warrantless search of Mr. Gillard's phone did not violate the Fourth Amendment because he voluntarily consented to the search of the phone. *See* Omnibus Resp. at 11–12. The Government points out that (1) Mr. Gillard was read his constitutional rights, which he then waived; (2) law enforcement offered Mr. Gillard food and water; (3) Mr. Gillard gave oral and written consent to search his phone; and (4) Mr. Gillard, "who is a 46-year-old adult, never expressed any discomfort or reservations about providing consent." *See id.* at 12. Therefore, the Government claims that Mr. Gillard's consent was voluntarily given and, as such, the warrantless search was lawful. *See id.*

### 5. The Parties' Arguments in Their Supplemental Briefing Regarding Consent to Search

As indicated above, because of SA Becker's uncertain answers to the questions about what he stated to Mr. Gillard prior to Mr. Gillard consenting to have law enforcement search his phone during the hearing, the Court permitted the parties to submit supplemental briefing on this issue.

#### a. Mr. Gillard's Supplemental Arguments

In his supplemental brief, Mr. Gillard argues that the Government failed to meet its burden of proof to show that he voluntarily consented to the search of his phone. *See* Def.'s Suppl. Mem. of Law in Supp. of His Mot. to Suppress Cellphone Evidence ("Phone Suppl.") at ECF p. 2, ECF No. 219. He indicates that SA Becker could not recall the exact words he said to Mr. Gillard while in the interview room, and there is no video evidence to directly corroborate SA Becker's testimony that Mr. Gillard voluntarily consented to the search. *See id.* at ECF pp. 2–3. Further, Mr.

Gillard argues that even if there was video/audio evidence of the conversation in the interview room, SA Becker's statement to the effect of "You can either consent and save me the paperwork or I will get a search warrant" was coercive, thus negating any possible voluntariness of his consent.[45] *See id.* at ECF p. 3. He notes that he was in custody and handcuffed in the interview room when SA Becker asked him for consent. *See id.* at ECF p. 4. He also asserts that SA Becker told him that he would make his consent known to the sentencing judge, which made his statement even more coercive. *See id.*

### b.    The Government's Supplemental Arguments

In the Government's supplemental response, it appears to concede that "when investigators requested [Mr. Gillard's] consent to unlock the phone, they told [him] that it would be saving them some 'paperwork' if he consented, and if he did not consent that they would obtain a search warrant to unlock the phone." Gov't Suppl. Resp. to Def.'s Pretrial Mots. at 1, ECF No. 220. The Government recognizes that if law enforcement makes a false statement or misrepresentation, its burden increases to show that consent to search was voluntary. *See id.* at 2. It argues, however, that the agents' statements to Mr. Gillard were not misrepresentations because they had the authority to either seek consent or apply for a search warrant. *See id.* at 2–3. Also, to the extent Mr. Gillard was told that the agents would get a search warrant, this was not false because they had ample probable cause at that point to believe that his phone contained evidence of a crime. *See*

---

[45] Mr. Gillard also references a purported recording of SA Becker's interview with Mr. Maldonado in which he essentially tells Mr. Maldonado that he can either consent or they will get a search warrant to search his phones. *See* Phone Mot. at ECF pp. 4–5. In this purported recording, SA Becker also tells Mr. Maldonado that "we are getting in your phone either way." *Id.* at ECF p. 5. The Court uses the adjective "purported" here because Mr. Gillard did not admit evidence of this recording into evidence to be considered as part of the instant Motion.

*id.* at 3. Essentially, the Government contends that the agents simply and accurately informed Mr. Gillard of his options. *See id.* at ECF pp. 4–5.

The Government also asserts that the totality of the circumstances surrounding the encounter demonstrates that Mr. Gillard's consent was voluntary. *See id.* at 5. It indicates that law enforcement (1) only met with Mr. Gillard for approximately 20 minutes, (2) offered him something to eat or drink, (3) read his *Miranda* warnings (after which Mr. Gillard waived his rights and agreed to being questioned), (4) explained what would happen next, including appearing before a Magistrate Judge, (5) never questioned Mr. Gillard about the case, and (6) had a cordial conversation with him. *See id.* Additionally, it points out that Mr. Gillard was a man in his mid-40's with a significant criminal history. *See id.*

### 6.    Analysis

Preliminarily, there is a fundamental problem with Mr. Gillard's Motion that merits mentioning. In his original Motion, Mr. Gillard's only applicable argument that the warrantless search of his phone was unlawful was that he never gave written or verbal consent to search.[46] *See* Phone Mot. at ECF p. 5. He has also made statements, particularly at the status of counsel hearing on January 16, 2024, indicating his strong belief that he never signed the FD-26 "Consent to Search" form.[47] Now, based on SA Becker's uncertain testimony about the consent discussion during the evidentiary hearing, he contends that his consent was involuntary. *See* Phone Suppl. at ECF pp. 2–6.

---

[46] Mr. Gillard also claimed that there were no exigent circumstances to justify a warrantless search. The Government is not claiming that there were such exigent circumstances.

[47] These strong beliefs have been evidenced in his desire to have a handwriting expert testify that the signatures on the FD-26 form are not his.

These two contentions are not congruent with each other. Mr. Gillard cannot contend on one hand that he never consented verbally or in writing while also contending that the consent he gave was involuntary due to improper coercion by law enforcement. Essentially, Mr. Gillard in a *pro se* capacity is arguing he never consented, while Attorney Chestnut is arguing that Mr. Gillard indicated consent verbally and/or in writing, but the Court should conclude that this consent was involuntary. Overall, Mr. Gillard's arguments concerning the search of his cell phone are the equivalent of a murder suspect telling a jury that they were 1,000 miles away at the time of the homicide only to alternatively argue to the jury that if they were at the scene of the murder, they did not actually have the intent to kill the victim.

Putting the inherent conflict between Mr. Gillard's arguments for suppression aside, even when the Court separately considers his arguments, they do not warrant suppression. Starting with his argument that he never gave consent verbally or in writing to search, this argument is belied by the record. SA Becker testified credibly that Mr. Gillard, after already being read his *Miranda* warnings and having agreed to answer questions from SA Becker and TFO Schlosser, consented, both in writing (through the FD-26) form and verbally, to a search of his phone. Accordingly, Mr. Gillard's argument that he never gave consent to search of any kind is meritless.

Turning now to Mr. Gillard's argument about his consent being involuntary, this is also meritless because SA Becker did not make a false statement or misrepresentation to induce consent, and the totality of the circumstances surrounding his conversation with Mr. Gillard demonstrates that Mr. Gillard's consent was voluntary. Regarding SA Becker's statement(s) to Mr. Gillard, if SA Becker told Mr. Gillard that he could either consent to the search or they would obtain a search warrant to search and seize evidence from the phone, this statement was not false

or baseless because law enforcement had ample probable cause to believe there was a fair probability that evidence of narcotics trafficking would be found in the phone.[48]

As stated by another Judge in this District in addressing a defendant's argument that he involuntarily consented to a search of his phone due to law enforcement misleading him when they told him that they could obtain a search warrant for his cell phone:

> The agents had interviewed J.A. and reviewed the contents of her phone, and they confirmed that Mr. Adams' phone number matched the contact information in J.A.'s phone. The texts between Mr. Adams and J.A., some of which are included above, describe their agreement to facilitate sex work for J.A., and some texts even contemporaneously document that sex work. With J.A.'s interview and her text messages at their disposal, the agents undoubtedly had enough probable cause to obtain a warrant.

> In sum, the agents' threats to seize Mr. Adams' phone and obtain a warrant were not "baseless." *Cf. United States v. Hicks*, 539 F.3d 566, 571 (7th Cir. 2008) (finding that "baseless" threats to obtain a search warrant weigh heavily in favor of involuntary consent). Instead, the agents fairly explained how they would proceed if Mr. Adams refused consent, which does not undermine voluntariness.[49] *See, e.g.*, *United States v. Bertrand*, No. 19-525, 2022 WL 2718525, at *2 (E.D. Pa. July 13, 2022) (Bartle, J.) (concluding that defendant's consent was voluntary in a similar case because "[t]he fact that defendant was anxious for the return of his cellphone which he needed for his business" does not undermine voluntariness); *United States v. Nickas*, No. 21-143, 2022 WL 2834680, at *7-8 (M.D. Pa. July 20, 2022) (finding consent voluntary even though officers told defendant they would seek a search warrant for her cell phone if she didn't consent to a search); *United States v. Faruolo*, 506 F.2d 490, 493-94 (2d Cir. 1974) (holding that officers' stated intention to obtain a warrant in the absence of consent did not undermine

---

[48] The Court's previous discussion concerning the ample probable cause law enforcement had of Mr. Gillard's involvement in drug trafficking with Ms. Gillard (and that evidence of drug trafficking would be found in the Residence) is incorporated here.

[49] It bears noting that, in *Sebetich*, the Third Circuit warned that if an officer leads a suspect to believe that obtaining a warrant is a "forgone conclusion," then it will be more difficult for the government to meet their burden of showing voluntariness. 776 F.2d at 425. Instead, officers should assert that, in the absence of consent, they will seek a warrant which will only be granted if a judge finds there to be probable cause. *Id.* Here, the officers do seem to present the granting of a warrant to search as a forgone conclusion. *See* Interview Tr. 76 ("We have to write up – type up a search warrant. Go get it to the AUSA to get approval, go in front of a judge to get it sworn out, and then we can search the phone."). Although this is ill-advised, because there was significant evidence to support a finding of probable cause in this particular circumstance, I do not find the agent's statements misleading.

voluntariness because there was "no deceit or trickery" involved); *United States v. Lee*, 317 F.3d 26, 33 (1st Cir. 2003) ("[T]he appellant points principally to the fact that the police informed him that, if he did not consent to a search of the van, they would simply secure a warrant. Courts have held, with a regularity bordering on the monotonous, that this sort of statement, made in a case in which the facts were sufficient to support the issuance of a search warrant, does not constitute coercion."); *United States v. Compton*, 704 F.2d 739, 742 (5th Cir. 1983) (concluding that consent was valid even though agents threatened to obtain a warrant and search defendant's car in the absence of consent).

*Adams*, 637 F. Supp. 3d at 291–92.[50]

Along with there being no evidence of any false statement or misrepresentation, the totality of the circumstances of SA Becker's encounter with Mr. Gillard demonstrates that his consent was voluntarily given. The Court's analysis of the *Schneckloth* factors is as follows: The first factor is the individual's age, education and intelligence. 412 U.S. at 224. Mr. Gillard is in his mid-40's. Concerning his education and intelligence, during the status of counsel hearing on January 16, 2024, Mr. Gillard expressed that he was confident in his understanding of the law because of his prior experiences in the criminal justice system over the past 30 years of his life and his love of reading. Moreover, Mr. Gillard felt so confident about his legal knowledge that he eschewed appointed counsel and is now representing himself in this litigation. The second factor is whether the individual was read their constitutional rights. *See id.* Prior to Mr. Gillard giving consent to search, SA Becker read him his constitutional rights, Mr. Gillard waived those rights, and Mr. Gillard agreed to listen to SA Becker and TFO Schlosser's questions (even if he ultimately never gave them any substantive information). The third and fourth factors relate to the length of the police encounter, the duration of the questioning, and whether questions were repeated. *See id.* The length of the encounter between Mr. Gillard and law enforcement was brief, the tone of the

---

[50] There were two footnotes in the original quoted text. *See id.* at 291–92. Only the second of those footnotes is included here. It has been renumbered to correspond to the other footnotes in this memorandum opinion.

conversation was cordial, and there was no evidence presented that SA Becker had to repeat his question about consent to Mr. Gillard or that any questioning occurred outside of the consent question. *See United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018) (concluding consent to search was voluntary due lack of hostility in interaction between law enforcement and defendant). The final factor is whether law enforcement used any physical punishment or coercion. *See Schneckloth*, 412 U.S. at 224. Neither SA Becker nor TFO Schlosser used any physical coercion, and the setting in the interview room was not naturally coercive. While Mr. Gillard was undoubtedly in custody at the time he consented, he did not have to speak to the officers, yet chose to do so, and only two law enforcement members were in the room with him. *See United States v. Chan-Guillen*, No. 20-689, 2022 WL 986272, at *6 (D.N.J. Apr. 1, 2022) (determining defendant's consent was voluntary when he signed consent form while in custody and sitting in police station's interview room). At bottom, the Government has met its burden to show that Mr. Gillard's consent was voluntary under the totality of the circumstances. Accordingly, his Motion to Suppress the evidence seized from his cell phone will be denied.

## III.    CONCLUSION

For the reasons explained above, Mr. Gillard's motions will be denied. Mr. Gillard's Motion to Suppress Pole Camera Evidence is factually inaccurate, and Attorney Chestnut appeared to acknowledge as such during the evidentiary hearing. Three of Mr. Gillard's *pro se* motions which Attorney Chestnut incorporated into counseled motions—the Motion to Suppress Physical Evidence, Motion to Dismiss for Ineffective Prior Counsel, and Motion for Speedy Trial—are frivolous and meritless. As for the Motion to Sever, Mr. Gillard has failed to show that his charges are improperly joined with those of his Co-Defendants or that the Court should exercise discretion and sever his charges. Concerning the Motion to Suppress Evidence Seized During the Search of

the Residence, Mr. Gillard failed to satisfy his burden to show that the affidavit in support of the

search warrant for the Residence contained stale information or that the information in the affidavit

did not adequately demonstrate a fair probability that evidence of drug trafficking activity would

be found inside of it. Thus, the Magistrate Judge had a substantial basis for finding probable cause

to search the Residence. Finally, the Government met its burden to show that the warrantless search

of Mr. Gillard's cell phone was justified by Mr. Gillard providing voluntary consent to law

enforcement to conduct a warrantless search of the phone.

An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Judge

54